# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

JAMES DELESTER CRANDLE,            :

    Plaintiff,                              :

vs.                                                   :          CA 16-0550-MU

C.O. SIMS, et al.,                            :

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter came on for an evidentiary hearing/bench trial before the undersigned on August 25, 2020. Upon consideration of the evidentiary hearing testimony and the exhibits admitted without objection, the Court enters this memorandum opinion and order pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D. Ala. GenLR 73(b) & (d).[1]

## PROCEDURAL BACKGROUND

James Delester Crandle originally filed a § 1983 complaint in this Court on November 1, 2016, against Correctional Officers La'Tre Thompson and Ta'Eric Sims and Lieutenant Tunglia Hawkins, arising out of a September 6, 2016 incident at the Mobile County Metro Jail in which Thompson and Sims allegedly entered his cell and assaulted him (that is, they used excessive and unnecessary force against him). (*See*

---

[1] The parties consented to the exercise of jurisdiction by the undersigned on August 25, 2020. (*See* Doc. 84 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 85 (endorsed order of reference)).

Doc. 1). Crandle also claimed that Lt. Hawkins was an accessory to the excessive use of force by leaving him in pain and suffering from the assault by the two correctional officers. (*See id.* at 5-6). The Court construed the claims asserted against Thompson and Sims to be claims of excessive force, failure to intervene, and delay in medical care, and the claim against Lt. Hawkins as delay in medical care. (*See* Doc. 43, at 2). The Court granted summary judgment in favor of all three Defendants with respect to the delay in medical care claim but denied it with respect to Crandle's Fourteenth Amendment constitutional claim of excessive use of force and failure to intervene asserted against Defendants Ta'Eric Sims and La'Tre Thompson. (*Compare* Doc. 44 *with* Doc. 43, at 22).

## **PERTINENT EVIDENTIARY HEARING TESTIMONY**

Crandle was housed in the suicide wedge[2] at the Mobile County Metro Jail on September 6, 2016.[3] All inmates in that wedge were on lockdown 23 hours out of each day. Around 6:00 a.m. on September 6, 2016, the inmates were in their cells eating a breakfast that was served on a Styrofoam tray with a plastic spork. At 6:15 a.m., the roving wedge officers, Sims and Thompson, were retrieving the inmates' trays and sporks cell by cell before shift change.[4] When Crandle's cell door was opened by the

---

[2] This section of the jail consists of eight cells housing inmates who are on suicide watch because of suicidal ideations/statements or past attempts to commit suicide. The inmates in this unit are closely monitored, with the floor officers checking each inmate every 15 minutes.

[3] Crandle testified that he was arrested and placed in the Mobile Metro Jail on July 29, 2016, on a felony murder charge. Crandle pled guilty to murder on February 2, 2020. (*See* Doc. 86, Defendants' Exhibit 3).

[4] Crandle, Sims and Thompson agree that Crandle had earlier expressed his displeasure with the officers due to their failure to turn on the televisions at 6:00 a.m.

Pod officer, Thompson, followed close by Sims, entered the doorway of Crandle's cell. Thompson issued several verbal orders, and Sims one verbal order, to Crandle to back up to the rear of the cell so the officers could remove his tray and spork. During the course of these verbal commands, Thompson extended his arm in front of his person, motioning Crandle to move back. Instead of following the officers' verbal directions, Crandle got into a fighting stance (with one leg forward and one leg back) and then slapped hard (in a downward fashion) at Thompson's extended arm, knocking Thompson's hand/arm down[5] .[6] Thompson's reflex reaction was the delivery of two closed-fist blows to Crandle's face to gain control of the situation,[7] after which Thompson and Sims took Crandle to the ground and restrained him.[8] The struggle on

---

[5]     Even Crandle admitted that he slapped Thompson's hand/arm. Accordingly, the Court does not regard as significant any failure of the officers to include this fact in their written reports produced immediately after the incident.

[6]     Crandle testified that he "batted/tapped" Thompson's hand down because the officer's hand was "in [his] way."

[7]     There can also be little question, based on a review of Sims' narrative report, but that Officer Sims struck Crandle twice with a closed fist (once to the forehead and once to the left side of his ribcage). (*See* Doc. 86, Plaintiff's Exhibit 12). The undersigned, however, does not find credible Plaintiff's evidentiary hearing testimony that Thompson struck him approximately 10 times with a closed fist to the left side of the face and ribs and that Sims struck his head two to three times, as the Defendants' evidentiary testimony and contemporaneous reports completed at the time of the incident (*see id.,* Plaintiff's Exhibits 11 & 12) establish that Crandle was not struck the number of times he claims. Moreover, the officers' testimony that the blows were instantaneous (happening in "a split second") and occurred before Crandle was taken to the ground and restrained is inherently credible and finds further support in the NaphCare medical records, which reveal only slight swelling of the left jaw, no swelling, bruising or deformity of Crandle's throat, and no evidence of a busted lip or nose that Crandle claimed during the hearing that he sustained on September 6, 2016 (*see id.,* Plaintiff's Exhibit 13).

[8]     The Mobile County Sheriff's Office Standard Operating Procedure on Use of Force essentially states that physical force is never to be used for punishment and, further, that when using physical force, the least amount of force necessary to control a situation is the force (Continued)

the ground lasted a while because of Crandle's active resistance; however, there was no testimony or evidence offered establishing that Sims and Thompson continued to strike Crandle with their fists once he was on the ground nor anything remotely suggesting that the officers continued their assault once Crandle was restrained in handcuffs. While the officers were not scared for their lives during the altercation, they did fear being hit and injured by Crandle.

Crandle was transported to the health clinic where personnel noted slight swelling to Plaintiff's left jaw but no swelling, bruising or deformity was noted to the throat and no distress was noted. (Plaintiff's Hearing Exhibit 13). An x-ray of the jaw was ordered and taken the following day, September 7, 2016; however, the x-ray revealed no acute/ significant findings. (*See id.*). While in the clinic on the morning of the incident, Crandle refused proffered Ibuprofen for pain.[9]

## CONCLUSIONS OF LAW

### A. Excessive Use of Force and Failure to Protect/Intervene.

The pivotal issue in this case, as set forth on summary judgment (*see* Doc. 43), is whether the defense of qualified immunity acts as a bar for suit against Defendants Thompson and Sims in their individual capacities. Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

to be utilized. (*See* Doc. 86, Plaintiff's Exhibit 10). According to Sims, had the officers' retreated once Crandle hit Thompson's hand, the officers would effectively be ceding control of the jail to the inmates.

[9] Crandle testified that he refused the medication because Ibuprofen "eats" the lining of the stomach.

which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). A party is eligible to claim qualified immunity if he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir. 2004) (citation omitted). The parties are in agreement that Sims and Thompson were acting within their discretionary authority at the time the complaint arose. (*See generally* Doc. 68, Joint Pretrial Document). Crandle bears the burden now to establish that qualified immunity is inappropriate. *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002).

  The Supreme Court has adopted a two-step analysis for resolving claims of qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). First, a court must decide whether the facts established by a plaintiff "show the [defendants'] conduct violated a constitutional right[.]" *Id.* Second, the court must decide "whether the right was clearly established." *Id.* The determination of these elements may be conducted in any order. *Pearson, supra,* 555 U.S. at 236, 129 S.Ct. at 818. In this particular case, the Court will first determine whether the evidence presented during the evidentiary hearing establishes a constitutional violation.

Given that Plaintiff Crandle, at all times relevant to this excessive-use-of-force action, was a pretrial detainee at the Mobile County Metro Jail, "'the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment, governs our analysis.'" *Jacoby v. Mack,* 755 Fed.Appx. 888, 896 (11th Cir. Nov. 8, 2018), quoting *Goodman v. Kimbrough,* 718 F.3d 1325, 1331 n.1 (11th Cir. 2013); *see Kingsley v. Hendrickson,* 576 U.S. 389, 400, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416 (2015) (noting "pretrial detainees (unlike convicted prisoners) cannot be punished at all . . . ."); *cf. Piazza v. Jefferson County, Alabama,* 923 F.3d 947, 952 (11th Cir. 2019) ("After *Kingsley*, then, if force used against a pretrial detainee is more severe thanis necessary to subdue him or otherwise achieve a permissible governmental objective, it constitutes 'punishment' ant is therefore unconstitutional.").

In *Kingsley,* the Supreme Court identified two separate state-of-mind questions that must be considered when evaluating excessive force claims of pretrial detainees. "The first concerns the defendant's state of mind with respect to his physical acts–*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world." 576 U.S. at 395, 135 S.Ct. at 2472. In other words, a defendant must possess a purposeful, knowing, or reckless state of mind – negligent conduct will not suffice. Here, Defendants do not dispute that Sims and/or Thompson punched Crandle with closed fists. "The second question concerns the defendant's state of mind with respect to whether his use of force as 'excessive'." *Kingsley, supra,* 576 U.S. at 395, 135 S.Ct. at 2472.

> [O]bjective reasonableness turns on the "facts and circumstances of each particular case." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865,

6

> 104 L.Ed.2d 443 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. See *ibid.* A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
>
> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.[10] *See, e.g., Graham, supra,* at 396, 109 S.Ct. 1865. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.

*Id.* (footnote added); *see also Piazza, supra,* 923 F.3d at 953 ("Obviously, 'legitimate interests'—including the need to 'preserve order and discipline' and 'maintain institutional security'—may at times require jail officers to use force. And of course, officers facing disturbances are often forced to make 'split-second judgments' about the need for such force 'in circumstances that are tense, uncertain, and rapidly evolving.' Because of this, we can't (and won't) evaluate a pretrial detainee's excessive-force challenge in a glib, post-hoc fashion or 'with the 20/20 vision of hindsight.' Instead, we must do our best to consider the situation through the lens of 'a reasonable officer on the scene.'" (internal citations omitted)).

---

[10] In the Joint Pretrial Document (Doc. 68), the parties stated that "[t]he essential evidentiary inquiry in [excessive force/failure to intervene] cases is the objective reasonableness of the force used given the totality of the circumstances." (*Id.* at 1).

In evaluating the objective reasonableness of the Defendants' actions, this Court assesses the totality of the situation, including the factors identified in *Kingsley.* Before turning to the facts of this case and their relation to the factors identified in *Kingsley*, the Court recognizes first that an inmate "is not at liberty to ignore or disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail." *West v. Sconyers,* 2010 WL 4822084, *7 (M.D. Ala. Nov. 3, 2010), *report and recommendation adopted,* 2010 WL 4823384 (M.D. Ala. Nov. 22, 2010). Consequently, any act of defiance permits the use of some force; however, "government officials may not use gratuitous force against a prisoner who has been already subdued or . . . incapacitated." *Skrtich v. Thornton,* 280 F.3d 1295, 1303 (11th Cir. 2002) (citations omitted). Moreover, "words alone do not justify the excessive use of force against a pretrial detainee[,]" *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir. 1990), *cert. denied sub nom. Hatcher v. United States,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991), nor may force, such as punching a suspect or detainee, be used when he is not resisting, *see, e.g., Hadley v. Gutierrez,* 526 F.3d 1324, 1334 (11th Cir. 2008) ("punching a non-resisting criminal suspect for no apparent reason other than malice . . . is not protected by our constitution"). Likewise, verbal defiance coupled with the failure to follow an order does not support the use of gratuitous force, *see Sawyer v. Asbury,* 537 Fed.Appx. 283, 294-95 (4th Cir. Aug. 13, 2013), *abrogated on other grounds as recognized in Brooks v. Johnson,* 924 F.3d 104 (4th Cir.2019), and a detainee's single strike at an officer may "not necessarily justify the deputy responding with two to three punches or necessitate that the other officers apply additional force" to the detainee. *Cortes v. Broward County, Florida,* 758 Fed.Appx. 759, 765 (11th Cir. Dec. 18, 2018). In

contrast, however, fist strikes, kicks, or taser usage may be reasonable uses of force against an individual actively resisting an officer. *See, e.g., Baker v. Clements,* 760 Fed.Appx. 954, 957 (11th Cir. Feb. 4, 2019) (fist strike was objectively reasonable where plaintiff "attempted to evade arrest by flight and had refused multiple orders to get on the ground, to stop resisting, and to give his hands to the officers."); *Mobley v. Palm Beach County Sheriff Dep't,* 783 F.3d 1347, 1355 (11th Cir. 2015) (use of force, including striking, kicking, and tasing, was reasonable where the plaintiff "refus[ed] to surrender his hands to be cuffed despite the application of escalating force and repeated use of a taser"). And, finally, "'[o]nce a prisoner has *stopped resisting* there is no longer a need for force, so the use of force thereafter is disproportionate to the need.'" *Piazza, supra,* 923 F.3d at 953, quoting *Danley v. Allen,* 540 F.3d 1298, 1309 (11th Cir. 2008), *abrogated on other grounds by Kingsley, supra; see also id.* ("[B]ecause force in the pretrial detainee context may be defensive or preventative—but never punitive—the continuing use of force is impermissible when a detainee is complying, has been force to comply, or is clearly unable to comply.")*.*

In this case, the undersigned must determine whether the force used against Crandle was objectively unreasonable—*i.e.,* whether it was "excessive in relation to [its] purpose. *Kingsley,* 576 U.S. at 398, 135 S.Ct. at 2473-74.To recap, the critical events began when Crandle refused to respond to the verbal commands of Sims and Thompson to back up to the back portion of his cell to allow the officers to retrieve his breakfast tray and spork during the final cleanup before the shift change. Indeed, Thompson was attempting to direct Crandle to where he wanted the inmate to go with a raised and extended arm. Instead of following the officers' instructions/commands,

9

Crandle assumed a combative/fighting stance—with one foot forward and one back—and then slapped/hit Thompson's extended hand/arm hard enough to knock it down because, according to Crandle, Thompson's hand was in his way. On reflex, Thompson delivered two closed fists to Crandle's face, while Sims delivered one closed fist to Crandle's face and one to the left rib cage, and then took Crandle to the ground. The delivery of these blows took mere seconds.  And while Crandle continued to resist the officers' attempts to restrain him in handcuffs while on the ground, there was no testimony that any more punches were thrown by the officers and certainly no testimony that punches were thrown after Crandle was restrained and complying.

     Crandle's failure to follow the lawful orders of Sims and Thompson to back up in his cell so that they could retrieve the tray and spork would have justified some force but when Plaintiff's failure is then combined with his decisions to take a fighting stance and thereafter slap/hit Thompson's extended hand/arm with enough force to knock the officer's hand down, the total of four punches delivered instantaneously by Thompson and Sims was a permissible use of force given Crandle's resistance "and the officers' need to 'preserve internal order and discipline' and 'maintain institutional security.'" *Piazza, supra,* 923 F.3d at 954, citing *Kingsley, supra,* 576 U.S. at 397, 135 S.C.t at 2473. While neither Thompson nor Sims were in fear for their lives at the hands of Crandle, they were fearful that if they took no action that Crandle may continue to strike out and injure one or both of them. This fear was credible, particularly in light of Crandle's testimony that he slapped Thompson's extended arm because it was "in [his] way." Moreover, there was certainly a security problem at issue not only because of Crandle's non-compliance and striking of Thompson but also because had the officers

succumbed to Crandle's defiance and combative actions, the table would have been set for the ceding of all control of the suicide wedge to the inmates. Furthermore, Crandle's minimal injuries (consisting principally of a slightly swollen left jaw) underscore the reasonableness of the force utilized. And, finally, Sims and Thompson certainly tempered the amount of force utilized by not continuing to throw punches once Crandle was taken to the ground. To be sure, Crandle continued to struggle and resist the officers while they attempted to restrain him in handcuffs; however, there is no testimony that the officers continued to punch Crandle while on the ground and certainly no testimony that they punched him once he was restrained in handcuffs. The undersigned finds that the force used by Sims and Thompson was objectively reasonable, not excessive, and, thus, not unconstitutional.

Because the evidence does not establish that excessive force was used against Crandle (that is, there was no constitutional violation), his failure to intervene claim (which, from the evidentiary hearing testimony, appears to be asserted against Officer Sims) fails. *Terry v. Bailey,* 376 Fed.Appx. 894, 896 (11th Cir. Apr. 27, 2010) ("Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence.").[11]

Because Crandle has failed to establish the violation of any constitutional right, Sims and Thompson are entitled to qualified immunity.

---

[11] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

## **CONCLUSION**

Based upon the foregoing, it is **ORDERED** that Plaintiff James Delester Crandle's Fourteenth Amendment excessive use of force and failure to intervene claim(s) against Sims and Thompson be **DISMISSED WITH PREJUDICE** because Crandle has failed to establish the violation of any constitutional right, thereby entitling the Defendants to qualified immunity**.**[12]

**DONE** this the 1st day of September, 2020.

                                          s/P. Bradley Murray
                                          **UNITED STATES MAGISTRATE JUDGE**

---

[12]     The Clerk of Court is **INSTRUCTED** to **CLOSE** this matter.